## W. H. GARLAND *v.* MARY GARLAND.

1. HUSBAND AND WIFE — SEPARATE MAINTENANCE. — In England a bill in equity will lie to compel separate maintenance when the wife is turned out of doors, or ill treated, or when the husband has quitted the kingdom without making any provision for the wife.

2. SAME — SAME — GENERAL RULE IN ENGLAND. — The general rule is, that a bill for maintenance without asking for a divorce could not be maintained in England, yet the chancery courts have seized upon every pretext for taking jurisdiction, with a view to her protection and support.

3. SAME — SAME — RULE IN AMERICA. — Courts of equity in America will always interpose to redress wrongs when the complainant is without full, adequate and complete remedy at law. Here there is no such process as *supplicavit*, nor a distinct proceeding for the restitution of the conjugal relations. If a wife is abandoned by her husband without means of support, a bill in equity will lie to compel the husband to support the wife without asking for a decree of divorce.

4. SAME — MAINTENANCE — VESTED RIGHT. — Maintenance is a vested right in the wife founded on the marriage contract, on the confidence reposed in the husband and on the great advantages given the husband over the property of the wife. It arises out of the marriage contract to support the wife together if they live happily; separate, if unhappy circumstances should separate them without criminality on the part of the

wife. This is the legal duty of the husband, and the wife has a right to demand it; but as her remedy when this right is denied is inadequate at law, equity will enforce it.

5. ART. 17, CHAP. 40, CODE OF 1857. — This statute was not intended to prohibit the courts in a proper case from affording protection to the respective estates of husband and wife, or from providing a separate maintenance for the wife, other than exclusively in proceedings for divorce.

APPEAL from the Chancery Court of Pike County. Hon. E. G. PEYTON, Jr., Chancellor.

The pleadings sufficiently appear in the opinion of the court.

*Cassedy & Stockdale*, for appellant, contended:

1. That the demurrer should have been sustained, as there is no jurisdiction in a court of equity to grant a separate maintenance to the wife, independent of a proceeding for divorce. Ball v. Montgomery, 2 Vesey, Jr., 195; Duncan v. Duncan, 19 Vesey, Jr., 396; 2 Story's Eq. Jur., §§ 1422, 1423, 1424, 1472. The same principle has been recognized in this state. Kenly v. Kenly, 2 How., 751; Porter v. Porter, 41 Miss., 116; 27 Miss., 630.

2. That the Code of 1871, like the Code of 1857, allows alimony only when divorce shall be decreed. § 1772.

3. That if there exist no legal grounds for divorce, then the wife who lives separate from her husband, must take the risk of a support by those means which the common law provides to charge her husband with her maintenance. A court of chancery has no remedy for her unless she can throw the burden of blame upon her husband to the extent of constituting a breach of his marriage vows.

4. That the bill fails to show such a peculiar state of facts as will justify a court of equity in granting relief on the ground that there is no adequate remedy at law for a maintenance out of the property of the husband. It fails to show a right of the wife to a maintenance by the husband, out of his property. It fails to show a neglect or refusal on the part of the husband to furnish

his wife and child with necessaries. It shows a separate estate of the wife, and an occupation yielding some support, which is subject to her control, without any molestation by the husband. It shows a residence of both husband and wife, where they now live, and a large amount of tangible property subject to any legal demands she may have against it. And she has an ample remedy at law against him for whatever rights she may have.

*Harris & George*, for appellee, insisted :

1. That according to the principles which govern courts of chancery, the bill presents a case for relief. That the wife has an acknowledged legal right to be supported by her husband, and it is the legal duty of the husband to provide for this support, and in abandoning her without cause, and refusing to support her, he thus violates not only a legal duty, but he commits a breach of the contract of marriage, which entitles the wife to redress, not only in the form of a rescission, but in the form of enforcement by decree of specific performance to the extent of compelling maintenance.

2. That whilst the courts of law fully recognize the right of the wife to this support, and the duty of the husband to provide it, they are incapable of enforcing the contract directly, owing to the legal disability of the wife, therefore they have limited their action to the indirect method of allowing those who supply the wife to sue the husband at law. That the disability resulting from the marriage contract, alone prevents the interposition of the courts of law, for as between persons *sui juris*, a contract for maintenance would be enforced. The indirect action of the courts of law are inadequate to compel the husband to perform his duty.

3. That the right to a bill in equity to enforce maintenance, independent of special statutes, has been recognized in many states, as existing independent of the suit for divorce. In England the court of chancery declined to decree separate maintenance except where that court had dominion over property belonging to the wife, or where the ecclesiastical court had decreed

alimony.   2 Bright, Husb. and Wife, p. 354; yet courts of equity there on the slightest jurisdictional pretext would decree separate maintenance.   Peachy on Mar., pp. 158, 173.   That the scope and extent of the wife's equity to separate maintenance rests on the acknowledged right of the wife to maintenance independent of the consideration of any property right in her.   The exclusive author-ity of the ecclesiastical courts over the subject of marital rela-tions and the peculiar status of the wife at common law, restrained the courts of equity in England.   2 Story Eq. Jur., § 1423, n. (a.); Bishop on Husb. and Wife, 553; 7 B. Monroe, 49; 3 Dana, 38; 4 Littel, 201; Purcell v. Purcell, 4 Hen. & Munf., 507; Glover v. Glover, 16 Ala., 440; Galland v. Galland, 38 Cal., 265.

TARBELL, J., delivered the opinion of the court.

The complaint of Mary Garland represents that she was married to William H. Garland in 1855; that they lived together as hus-band and wife until 1867; that in the latter year they signed writ-ten articles of separation; that such separation was to be final, ex-cept by the consent of both parties; that toward the close of the year last named, the parties, by mutual consent, resumed their re-lation as husband and wife, and lived and cohabited together as such, until 1871; that the contract of separation was signed by the complainant because of the threats, persecution and insufferable conduct of William H. Garland, and not because of her desire to abandon her conjugal relations with her husband; that all of the property she owns is a house and some lots of land in the town of Summit, in Pike county, and some lands, of no value for the means of support except by a sale; the house, she uses for a residence for herself and two daughters; that she has no means of support for herself and family, except occasionally she has a few day or month boarders; that without the relief prayed for in her bill of complaint, her property will have to be sold for taxes; that Wil-liam H. Garland is the owner of the lands described and set forth in the bill; that of the value of the property and amount of rents of

the same annually received, complainant is not informed, and prays a discovery; that William H. Garland recently caused to be published in the newspaper printed in the place of the residence of the parties hereto, a notice to all persons not to give credit to any one on his account; that this notice was intended, and has the effect of preventing complainant from getting even the means of subsistence on his account and credit; that in January, 1871, her husband, William H. Garland, ceased to live and cohabit with her as his wife; that he has since repeatedly insisted that the complainant should sue for a divorce from him because of his desertion of her, and that if she did not institute proceedings for that purpose, he would; that she has been guilty of no act which would justify a divorce; that she does not desire to be released from the bonds of matrimony; that she has on many occasions entreated her husband to live with her again as his wife; that he has many times promised by parol and by letter that they would again be reunited as husband and wife; that the separation was entirely against her will; and although she signed and acknowledged the articles to that effect, she still hoped her husband would change his mind and again live publicly with her as his wife; that complainant has allowed no fit and proper opportunity to pass without calling her husband's attention to his promises to live with her again as his wife, and he as often assured her that the time would soon come when they would resume their matrimonial relations; that at the time of the separation on paper, she had no idea that the same was intended as a means to effect a legal separation from the bonds of matrimony; she hoped that in a short time after the execution of the contract of separation, a reconciliation and reunion would take place; that complainant knows of no sufficient reason why the same should not occur, as it was and is her earnest wish; that at all times since their separation she has been willing to resume her marital obligations to her husband and live and cohabit with him again as wife, and render to him all the duties of wife, of all which her husband has full knowledge,

and that she was ready, and willing and anxious that they should live together as husband and wife; complainant avers that although she has by her husband been abandoned, uncared for and threatened with vexatious litigation, she is now willing to resume her duties as wife and do whatever she can for the future happiness of " her husband, and to relieve herself from that widowhood not brought on by any cause or fault of hers," and charges that the contract of separation was never of binding force, or if it was, that it has been annulled by mutual consent, according to its terms ; wherefore the bill prays that William H. Garland be made defendant; for discovery of his property; for an allowance pending this litigation; for injunction ; that the agreement of separation be annulled ; that an account be taken to ascertain and fix a proper amount for the yearly support of complainant ; and for an order and decree that the same be paid annually; and that such amount be fixed, ascertained and decreed to be a lien on the property of the defendant ; for general relief, etc.

The foregoing presents, somewhat fully, the allegations of the original and an amended bill. The case was heard before the chancellor on demurrer. To the original bill, the following causes of demurrer were assigned :

1. No equity on the face of the bill.

2. The bill presents no case within the jurisdiction of the court as justifies the relief prayed for.

3. The complainant avers no discharge or willingness to discharge her conjugal duties to her husband as entitles her to the rights of a wife.

4. She shows no reason in law to justify her living separate from her husband, other than a voluntary separation, which does not entitle her to a separate maintenance.

5. The bill does not show any failure of defendant to discharge any duty as husband.

6. The bill shows no such *prima facie* case as entitles complainant to an allowance for attorney's fees, or other allowance, pend-

ing the litigation, if she was without separate property, but the bill shows she owns separate property adequate for such purposes.

This demurrer was sustained, with leave to complainant to amend her bill. This was done, and to the amended bill the following causes of demurrer were filed :

1. No equity on its face.

2. It presents no such case within the jurisdiction of the court as justifies the relief prayed for.

3. It does not show or charge any default on the part of the defendant to maintain complainant, or that she has failed to procure what is necessary from him, or that she ever disclosed to him any necessity for his aid, or that he ever refused any demand made on him for maintenance.

4. Nor does it show a right to allowance for attorney's fees.

This demurrer was overruled, and the defendant appealed, assigning for error the decree overruling the demurrer to the amended bill.

From the foregoing synopsis of the pleadings, it will be seen that the case presented for adjudication is that of a wife without fault and without the means of support, deserted or abandoned by her husband, who, fully aware of her situation, not only does not supply her wants, but gives notice to the public not to trust any one on his account, except on his order, or the order of his agent.

Under these circumstances the bill seeks to compel the husband to provide, out of his property, a suitable support for the wife, without asking for a divorce.

The sum of the argument in answer to the complaint is, that the chancery court has not jurisdiction to award separate maintenance, except when the proceeding has for its object some other specific, substantive relief, as for divorce, to which an allowance is an incident. Apparently, this is the doctrine of the authorities, and, if understood, this is the view entertained by Mr. Bishop in his treatise on marriage and divorce, though he admits that the

contrary rule has obtained a footing in American jurisprudence. As the question is, with us, one of first impression, a somewhat careful consideration of the subject will be undertaken.

In support of the argument of the demurrant, reference is made to Ball v. Montgomery, 2 Ves., p. 195; Duncan v. Duncan, 19 id., 396; 2 Story's Eq. Jur., §§ 1422, 1423, 1424, 1426, 1472; Kenly v. Kenly, 2 How., 751; Porter v. Porter, 41 Miss., 116; Lawson v. Shotwell, 27 id., 630; 2 Kent's Com., 147; Code of 1857, art. 13, p. 334.

The contest in Ball v. Montgomery was with reference to dividends on stock, which was the subject of a marriage settlement. The wife eloped soon after the marriage, whereupon the husband instituted proceedings to obtain those dividends and interest, and to have the fund secured. The wife, at the time of the suit, was living in adultery. According to the report of the case, the questions therein were: "First. Whether the plaintiff was entitled to these dividends during the joint lives of himself and his wife, or whether she could claim them as a resulting trust to her separate use. Secondly. If the plaintiff was entitled, whether he could take the dividends without making a provision out of them for the wife. A third question was made at the bar, though not prayed by the bill, whether, if the plaintiff could not succeed, the dividends should not be brought into court."

During the argument of the case, in response to counsel, Lord Chancellor Loughborough said "that no court, not even the ecclesiastical court, has any original jurisdiction to give a wife a separate maintenance. It is always as incidental to some other matter, that she becomes entitled to a separate provision. If she applies in this court upon a *supplicavit* for security of the peace against her husband, and it is necessary that she should live apart, as incidental to that, the chancellor will allow her separate maintenance."

On the other hand, the distinguished counsel for the plaintiff, Sir John Scott, then attorney general, and Sir John Mitford, then

solicitor general, stated that "the ground for the separate provision of the wife must be, that, notwithstanding the material right of the husband, her situation is such that, being separate from him, she ought, in equity, to have a separate provision."

It will be observed that the chancellor recognizes the fact that, under circumstances, it may be necessary for the wife to live apart from her husband, in which case she would be entitled to an allowance, and that the eminent counsel for the plaintiff in that case stated that the situation of the wife might be such that, being separate from the husband, she ought, in equity, to have a separate provision. In what state of circumstances or situation can the wife be placed, appealing more strongly to a court of equity, than the desertion by the husband without cause, and his refusal to maintain her or permit others to supply her wants on his credit?

Duncan v. Duncan, 19 Ves., Jr., 395, was an application by the wife for separate support. The bill alleged cruel treatment by the husband, and consequent separation. The answer denied this allegation, and no proof was taken on either side. The master of the rolls, Sir William Grant, who was of counsel for the defendant in Ball v. Montgomery, *supra*, says: "I do not find an instance that, upon such a state of facts, a separate maintenance has been provided by the court, either out of the husband's property or that which was originally the property of the wife. The cases in which subsistence has been provided by the court, are either where the husband has turned her out of doors, or by ill treatment obliged her to leave his house, or had quitted the kingdom leaving her destitute. Cases of the first sort are: Oxenden v. Oxenden, 2 Vern., 493 ; Nicholls v. Danvers, id., 671, and Williams v. Callow, id., 752, questioned by Lord Rosslyn in Ball v. Montgomery, 2 Ves. Jr., 191, but sanctioned by Danvers v. Danvers, in the House of Lords, although Lord Rosslyn [Loughborough] says, "it is contrary to the established doctrine, that a married woman should be a plaintiff in a suit in this court for separate maintenance." Then follow, at length, the remarks of the

chancellor in Ball v. Montgomery, quoted above. The master of the rolls, in Duncan v. Duncan, then concludes as follows : "Cases of the other description are Colmer v. Colmer, Mosely, 121 ; Coop., 254; Watkyns v. Watkyns, 2 Atk., 96; Sleech v. Thorington, 2 Ves., 560, and Wright v. Morley, 11 id., 12, in each of which the husband had left the kingdom without making any provision for his wife, but I can find neither principle nor authority for what is asked in such a case as this, going no further than the fact that they live asunder."

It is an interesting fact, and not immaterial to this discussion, to state here, that in Ball v. Montgomery, the chancellor said of the cases referred to by the counsel : "I did not recollect that there were such cases as are cited from Vernon." The same counsel, afterwards as master of the rolls, cited the same cases in support of the same views. These cases have been consulted and found correctly cited. If a bill will lie by the wife, "when turned out of doors" by the husband, or "when by ill treatment she is obliged to leave the house," as in some of the cases, *supra*, why not when she is abandoned and refused support by him, and when, in addition thereto, he interferes to prevent her use of his credit ; and if, "when he has quitted the kingdom" or country, why not, when he has deserted her and prevented supplies on his credit, although he remains in the same state, county and town ? It is impossible to conceive, that "if the former cases afford just ground of equity jurisdiction, that the latter does not."

Kenley v. Kenley, 2 How., 751, was this : There was an ante-nuptial contract by the husband wherein he promised not to interfere with or claim the separate property of the wife. Soon after marriage she left him and filed a bill in which she charged cruel treatment, and prayed for a perpetual injunction against her husband intermeddling with her separate estate, and that the same be placed in the hands of a trustee for her use. The evidence disclosed no other or more cruel treatment than occasional sallies of passion and petulance of manners. It was not pretended that

he ever offered her violence or threatened it, or at any time she felt apprehensive for her personal safety. The husband repeatedly invited his wife to return, and promised her the most kind and affectionate treatment; and the only reason assigned for her refusal to comply with his solicitations was, "that her uncle Congar said it would injure their cause." In view of these facts, the court say: "It was a just conclusion, from the law and facts here stated, that had there been a separate maintenance decreed in favor of the appellee in this case, upon just grounds of cruel treatment, it would be discontinued upon the evidence here adduced, for the reason, that in such cases courts of equity will afford the wife no aid whatever to continue her separation from her husband, as it is deemed subversive of the true policy of matrimonial law and destructive of the best interests of society."

With reference to this authority, it need only be remarked, that in the case at bar the facts are, in important respects, reversed, the husband having deserted the wife and declines her appeals for reunion.

In Lawson v. Shotwell, 27 Miss., 630, the appellant, while she was Mary E. H. Shotwell, filed her bill against her then husband for a divorce, which was granted. No decree was asked or made for alimony. Subsequently, the wife filed supplemental and amended bills, seeking an allowance for support out of the husband's property, and to obtain restitution of property which she brought into the marriage. There was a demurrer to these bills, which was sustained, and the bills dismissed. This action of the court below was sustained on error. Referring to the claim for alimony, the court say: "We do not intend to intimate that there may not be cases in which an original bill, after a decree for a divorce, could not be maintained for alimony; but only that the present bill shows no sufficient reason for not taking, or at least, asking, such a decree from the circuit court, touching the matters now in litigation. A good reason must be alleged why the alimony was not at the proper time allowed." And then, as to the

restitution of the wife's property, it is said, " this was a matter for
the circuit court to adjudicate, and no good reason having been
shown why it was not acted on, the bill cannot, in this respect
either, be sustained." In the course of the opinion, several ques-
tions are incidentally mentioned, among others, the rule stated by
the chancellor, in Ball v. Montgomery, *supra*, is repeated; but it
does not appear to have been involved in the case.

Porter v. Porter, 41 Miss., 116, was an application for alimony,
*pendente lite*, and a writ of error to review the action of the chan-
cery court on this branch of the case. The suit was instituted for
divorce. The opinion of the court contains nothing bearing on
the case at bar. It was simply held, that if the bill contain suf-
ficient matter, if true, to entitle the wife to a divorce, an allowance
was a matter of course.

By art. 13 of the Code of 1857, p. 334, divorces are authorized
in certain cases, and the court, in granting such divorces, may de-
cree " protection to the parties in regard to their property." Sec-
tion 17 empowers the court, in such cases, to ." make all orders
touching the care, custody and maintenance of the children of the
marriage, and also touching the maintenance and alimony of the
wife." An argument is not supposed to be necessary to show
that this statute no more intended to forbid the courts, in a proper
case, from affording protection to the respective estates of husband
and wife, or from providing a maintenance for the latter, other
than exclusively in proceedings for divorce, any more than it was
designed thereby to deprive the courts of their power, when prop-
erly invoked, to provide for the care, custody and maintenance of
children in other cases than those of divorce.

There are numerous adjudications on this point, all holding the
statute, in the respect indicated, to be cumulative.

2 Story's Eq. Jur., §§ 1422, 1423, 1424, have reference to the
English cases already mentioned. In § 1422 this author says:
" A woman may be totally abandoned and deserted by her hus-
band; or she may be driven from his home, and compelled by

his ill-treatment and cruelty to seek an asylum elsewhere. The question, therefore, may arise, whether, under such circumstances, courts of equity have a general authority to decree alimony to the wife when she is left without any other adequate means of maintenance. To this question, propounded in its general form, it can scarcely be said that, according to the result of the authorities, an answer in the affirmative can be given in positive terms."

Referring to these same English cases, the chancellor, in Purcell v. Purcell, 4 How. & Mun., 511, alludes to the clashing of the English judges upon the question under consideration, and observes "that if the jurisdiction of the court were now to be settled upon English precedents, there might be some doubt about the question, from the cases, as brought into one view by Mr. Vanblanque." It is sufficient for the present discussion that, according to the English precedents, the question at bar is left in "doubt." Before proceeding to a consideration of the American adjudications, however, on this subject, a further mention of the practice in this class of cases in England, may seem to present more vividly the "clashing of the English judges," and "the doubt" as to the rule there. If in England a wife's claim to a separate maintenance is not, *per se,* a question proper for discussion in a court of equity, yet the case may be so mixed up with circumstances as to render the interposition of the court of chancery expedient and even necessary.

A few of these circumstances may be named: When the husband has left the kingdom without making any provision for the wife. Duncan v. Duncan, 19 Ves. Jr., 394, and authorities therein cited.

If the husband, after assigning part of his wife's equitable interest in stock, abandons her, without making any provision for her support, chancery will order the dividends accruing upon the remainder of the stock to be paid to her. Wright v. Morley, 11 Ves. Jr., 12. Watkyns v. Watkyns, 2 Atk., 98.

When the wife has been used with cruelty, which would justify

her proceeding by *supplicavit* against her husband, the court may decree her maintenance out of any funds within its reach, belonging either to the husband absolutely, or in right of his wife. Nicholls v. Danvers, 2 Vern., 671; Duncan v. Duncan, Coop., 256.

In an application by the wife merely to be placed in the same situation in which she would have been if a legal instrument, creating an actual trust in her favor, had not been wrongfully destroyed, the court took jurisdiction and awarded relief, although she was living in adultery. Seagrave v. Seagrave, 13 Ves., Jr., 413; Sidney v. Sidney, 3 P. Wms., 276.

Although the propriety of so doing has been constantly doubted, yet the chancery courts of England take jurisdiction of cases to enforce specific performance of written articles of separation, and a separate maintenance to the wife. Fletcher v. Fletcher, 2 Cox, 99; 3 Bro. C. C., 619.

As a rule, when the husband appeals to the court against the wife to obtain possession of her separate estate, he will be compelled to make provision for her, or the property will be taken in charge by the court, even though the wife had eloped and lived in adultery. Ball v. Montgomery, *supra.*

The chancery courts of England will also take jurisdiction of a proceeding by the wife against her husband for a restitution of conjugal rights or relations; a decree for such resumption will be enforced by dealing with the husband as for contempt, or for separate maintenance to the wife.

According to Vanblanque, vol. 1, p. 94, "a wife may have a separate estate from her husband, as by agreement, or by decree for ill usage, or alimony."

And while the courts of England refuse to decree separation in a proceeding to enforce specific performance of articles for that purpose, and for separate maintenance, they will, in such case, take jurisdiction expressly to decree support; though this is regarded as a "singularity." 2 Bright's H. & W., 327.

By reference to the cases cited in 1 Vanb., 104, 105, it will be

seen that there have been adjudged cases in England where the court of chancery has decreed alimony to the wife. Some of these are cases of agreement; others where proceedings were had against the husband in the ecclesiastical courts, *propter sævitiam;* while there are cases of decrees in equity in favor of the wife, without any of those " circumstances " referred to, merely on the ground of ill usage, or desertion of the wife by the husband, when there was no divorce, and no agreement to separate. 1 Vanb., 104-5; 1 Ch. R., 24; 2 Vern., 752; 2 Atk., 96.

Hence, as Lord Loughborough acknowledged, his memory was at fault, when he said there were no cases to compel a husband to provide a separate maintenance for his wife, except as incidental to some other proceeding. But even if he was right, can a reason be framed why, if a separate maintenance will be awarded when the wife is turned out of doors by the husband, it will not be decreed in case he abandons her, persistently declines restitution of the marital relations, and by notice, prevents the use of his credit for her support?

For the purposes of this discussion, it is sufficient either that the practice has not been uniform, or that the rule is in " doubt " in England. An inspection of the English cases shows the rulings there conflicting and inconsistent. This is clearly shown in 2 Dess.; 4 id.; 4 Hen. & Mun., 507; 38 Cal., 265; 1 Bright's H. & W., 255, and other cases herein.

Certainly, in several cases, alimony was decreed where there appears no sentence of separation or agreement, and in some of these it appears there was neither a divorce nor an agreement to live separate. Nicholls v. Danvers, 2 Vern., 761; Oxenden v. Oxenden, id., 493; Williams v. Callow, id., 752; Lashbrook v. Tyler, 1 Ch. Rep., 24; Watkyns v. Watkyns, 2 Atk., 97; 1 Bright, H. &. W., 255.

And not only did Lord Loughborough overlook or forget the above cases, when presiding as chancellor, in Ball v. Montgomery, but in the later case of Bullock v. Menzies, 4 Ves., Jr., 798,

wherein he also presided, he recognizes desertion as a ground of equitable interference in behalf of the wife, contrary to the rule previously declared by him.

In the still later case of Wright v. Morley, 11 Ves., Jr., 12, Sir William Grant, master of the rolls, says: " As to the bill of the wife upon the grounds I have stated, I cannot give her the whole of the dividends. But upon several cases, Watkyns v. Watkyns, 2 Atk., 96; Bond v. Simmons, 3 id., 20; Colmer v. Colmer, Mosely, 119; Sleech v. Thorington, 2 Ves., Sr., 560; and the late case before Lord Rosslyn (Loughborough), Bullock v. Menzies, 4 Ves., Jr., 798, there is no difficulty in giving her the remainder for her separate use during the absence of her husband."

At all events, the English chancery courts not only have not abstained from interference in favor of the wife, but they have absolutely and affirmatively seized upon every excuse, even the slightest pretext, for taking jurisdiction, with a view to her protection and her support. There would seem to be no possible circumstances in which courts of equity in England, have not taken jurisdiction for the protection and maintenance of the wife, except in the single instance of desertion, simply disconnected from all other facts and circumstances of equitable interference, thus doing indirectly, or in a roundabout way, what they declined to do directly, and upon grounds evidently peculiar to the English system of government.

Sir William Grant, both as counsel and as master of the rolls, favored jurisdiction in such a case, and took a wider, broader and better view than the chancellors and judges. Why this jurisdiction was refused, can only be conjectured to have resulted from the common law theory of the superiority of the husband and the subordination of the wife. The argument was with Sir William Grant. Reason, philosophy and the conscience, which are the basis of equity, certainly favor it. No solid objection has been or can be made to it. A careful examination of the authorities leads to the reflection that English equity, as between hus-

band and wife, has been partial to the former, and has denied to the latter a just, reasonable and clear equity.

"The suit for alimony is given to the wife in case of separation, if the husband refuses to make her an allowance suitable to their station in life and his fortune." 3 Bl. Com., 93, 4.

" Alimony is a vested right, on a proper case being made out. It arises out of the marriage contract to maintain the wife, to-gether, if they live happily ; separate, if unhappy circumstances should separate them without criminality on the part of the wife. It is an allowance out of the husband's estate for the wife's sup-port, on consideration of all the circumstances." 1 Bl. Com., 441, 2.

"Maintenance is a vested right in the wife, founded on the marriage contract ; on the weakness of the sex ; on the confidence implicitly reposed in the husband ; on the great advantages given to the husband in and over the property of the wife. It is a duty to allow it." 2 Bl. Com. 302; Godolphin, 509 ; 1 Leving, 6.

These quotations from the great commentator seem to prove that theory and practice of the laws of England are not in harmony.

Turning to the U. S. it is found that the courts have disagreed on this subject. Several of the states have, by legislation, con-ferred on their chancery courts this jurisdiction, which, in some, has been denied by their courts. The question is substantially one of first impression in our own state. In the following cases, the juris-diction invoked herein is affirmatively asserted as one eminently equitable, and in some of them the English decisions are reviewed and criticised as irreconcilably antagonistic. Purcell v. Purcell, 4 Hen. & Mun., 507 ; Prather v. Prather, 4 Dess., 33 ; Mayhugh v. Mayhugh, 7 B. Mon., 424 ; Butler v. Butler, 4 Littel, 202 ; Lock-ridge v. Lockridge, 3 Dana, 28; Glover v. Glover, 16 Ala., 440 ; Jelineau v. Jelineau, 2 Dess., 45 ; Anonymous, ib., 198 ; Denton v. Denton, 1 John. Ch., 364; ib., 441 ; Miller v. Miller, 1 Saxton, 386 ; Galland v. Galland, 38 Cal., 265 ; Wallingsford v. Wallings-ford, 6 Har. & J., 485 ; Helms v. Franciscus, 2 Bland. Ch., 568.

Mr. Story, in his Eq. Jur., § 1423, a, says : " In America, a

broader jurisdiction in cases of alimony has been asserted in some of our courts of equity; and it has been held that if a husband abandons his wife and separates himself from her without any reasonable support, a court of equity may, in all cases, decree her a suitable maintenance and support out of his estate, upon the very ground that there is no adequate or sufficient remedy at law in such a case. And there is so much good sense and reason in this doctrine, that it might be wished it were generally adopted." No sufficient reason can be offered in answer to the broad proposition of Mr. Story, and the objector must rely upon the technical fact that it has not obtained in England. Purcell ˏv. Purcell, 4 Hen. & Mun., 507, presented three questions, marriage, desertion, and the right of the wife to a separate maintenance. The two first averments were established. As to the third, the chancellor said: "I hold, that in every well regulated government there must somewhere exist a power of affording a remedy when the law affords none; and this peculiarly belongs to a court of equity; and as husband and wife are considered as one person in law, it is evident that in this case the law can afford no remedy, which is universally admitted to be a sufficient ground to give this court jurisdiction, and therefore it must entertain the bill, if there be sufficient proof of the marriage." In the opening of his opinion, the chancellor said: "I shall leave the clashing of the English judges to be reconciled among themselves, and take up the question upon first principles." The marriage was sustained and the prayer for a separate maintenance granted. The decree required an annual payment by the husband to the wife "until he should restore her to the comforts of her bed and board, and give satisfactory assurances for her enjoyment thereof." This decree was enforced by committing the husband to prison for neglecting compliance. He purged himself of the contempt by paying to his wife the amount due and in arrear, and giving security for his future performance of the decree.

Precisely the same question under consideration was before the

courts of South Carolina in the case of Prather v. Prather, 4 Des., 33. The opinion is a searching review of the English decisions, and a very emphatic assertion of the equity of the rule which Story says, " it might be wished it were generally adopted." The court in that case observe : "It might be sufficient to say, that as there have been cases on both sides of the question, * * * I should feel myself at liberty to select those cases for my guide which applied to the circumstances of this country, and would best promote the purposes of justice. * * * The subject has been discussed, and the court has decreed that the wife should have a separate estate from her husband, in the case of ill usage, and a consequent separation or desertion by the husband, though no agreement for a separate maintenance and no divorce. * * * I allude to several cases which were decided in this court some years since, expressly on the ground that no other tribunal could give redress, and that it would be unseemly and highly mischievous if this court did not interfere." See also 2 Dess., 198, and cases in South Carolina therein referred to.

In Jelineau v. Jelineau, 2 Dess., 45, the argument against separate maintenance, as here, was, that the court had no power to grant it except as incidental to some other matter ; but the court say that the English cases cited adverse to the jurisdiction, "are by no means applicable to our local situation. * * * If there were no precedents of the interference of the court of equity in cases of this sort, we must make them, rather than so wanton an abuse of power by a husband over his wife, should escape with impunity."

Referring to the cases holding that alimony can be allowed only as an incident to some other special matter, the court, in Butler v. Butler, 4 Littell, 202, say : "But suppose the case of abandonment by a husband, and that the separation is complete without any sentence, and that the wife is left to the humanity of the world, without support, has the chancellor, without the statute, or in cases not embraced by it, no authority to direct a por-

tion of the husband's estate to be set apart for the support of the wife, leaving the marriage contract as obligatory as ever?" The answer to this question is a vindication of the jurisdiction.

The supreme court of Alabama, in Glover v. Glover, *supra,* use this language: "No one will deny but that the husband is bound by the strongest obligations, resulting not alone from the contract of marriage, but founded upon the highest moral consideration, to support his wife. And if it be true that the law, as well as enlightened conscience, creates this obligation, and no court can enforce its performance or compensate for its most cruel and flagitious violation, then indeed has one class of cases been found, which falsifies the boasted maxim, 'that for every wrong there is a remedy, and for every injustice, an adequate and salutary relief.'" And after adverting to the disagreements of the English chancellor, the court also say: "So stands the law in England, and since her learned chancellors have not been able to reconcile their own decisions, we feel that we shall not be wanting in respect for them in adopting a rule of decision for ourselves, which we conceive to be more consonant with an enlightened equity, and with the fundamental principles and maxims upon which the jurisdiction of our courts of chancery is based." Upon a full consideration of this question and of the authorities, in Galland v. Galland, 38 Cal., 265, the able opinion in that case concludes that the reasoning of the cases in support of the jurisdiction "appear to admit of no satisfactory answer." However the American cases may be arranged in point of numbers, the argument is believed to be unanswerably with those asssuming the jurisdiction under discussion. The adjudications above referred to were by courts, judges, and chancellors of exalted character, whose opinions command the highest respect in all courts, and they embrace states whose judiciary has ever ranged among the foremost in the counrt.

The answer made by the authorities to the position that separate maintenance is incidental to some other proceeding or right,

may, perhaps, be briefly and advantageously stated, thus: Here is a virtual divorce from bed and board by the act of the husband against the wishes of the wife. In the absence of ecclesiastical courts, and of the right to a suit for the restoration of marital rights, such a case must draw after it the doctrine and relief required by the circumstances, by our changed judicial system, by the condition of the country, and the wants of our society, else the greatest injustice might be done without any remedy. For, if the courts will not aid a wife who voluntarily separates from her husband, neither will they refuse redress when the husband abandons the wife and refuses to maintain her, because, in both cases, the purpose of the parties is "subversive of the true policy of the matrimonial law, and destructive of the best interests of society."

Hence, there is opened a way in this country for the practical realization of the evident desires of the English chancellors for the protection of the marital rights of the wife, who often found her cause dependent upon a jurisdiction assumed on a mere "pretext," or other doubtful ground. In Butler v. Butler, *supra*, Judge Mills said, "it is clear that a strong moral obligation must lie on every husband, who has abandoned his wife, to support her. The marriage contract and every principle bind him to do this. To fail to do it, is a wrong acknowledged at common law, though the law knows no remedy, because there the wife cannot sue the husband. But in equity, the wife can sue the husband, and it is the province of a court of equity to afford remedy where the conscience and the law acknowledge a right, but know no remedy. Why, then, should the chancellor shrink at this case and refuse a remedy? It is evident that this arose in England for fear of intruding upon the ground occupied by the ecclesiastical courts."

And in this quotation, the whole case at bar is embraced. With us, marriage rests in contract, and the obligation is both to the wife and to society. That the remedy at law, in case of a breach of this contract, is neither full, adequate nor complete, is plain to ordinary experience. The law's delays are proverbial. The

credit of a man, stubbornly determined not to support his wife, will not feed the hungry nor clothe the naked.   A man might be worth a large fortune, yet so situated as to defy judgment and execution.   The credit of one so disposed would avail nothing in the market in the way of procuring supplies, as merchants will not part with their goods upon such uncertain security.   With reference to the ecclesiastical courts of Great Britain, it may be remarked that, in the settlement of this country, they were not engrafted upon our institutions.   Neither did our forefathers transfer to this country the proceeding by *supplicavit,* as known in the chancery practice of England.   In the jurisprudence of that country there is, also, what is unknown here, a distinct proceeding for the restitution of conjugal relations provided, as is said, " as a sort of substitute for justice."   In the place of all these there is pointed out the more salutary, just and equitable remedy sought in the case at bar.

The observation of Mr. Story (Eq. Jur., vol. 2, § 1427), that the courts will afford the wife no aid in accomplishing a purpose " subversive of the true policy of the matrimonial law and destructive of the best interests of society," is applied by the author to a case wholly different from the one made by this record, viz., the " voluntary separation of the wife from the husband ; or, if he is *bona fide* ready and willing and able to maintain her, and she, without good cause, chooses to remain separate from him."

This leads to the solution and conclusion of the question under consideration, which, as presented by the bill, is that of a wife, without fault on her part, wilfully abandoned by the husband to whose support and protection she is anxious to return, but her requests for reunion are persistently refused by him.   Process for the restoration of marital rights being unknown to our jurisprudence, another and better remedy is in the power of chancery to compel the husband to support the wife until he shall restore her to his bed and board.   Support of the wife is the legal duty of the husband.   The wife has a right to demand it, but, as her remedy,

when this right is denied, is not full, adequate and complete at law, equity ought to enforce it. In abandoning the wife without good cause, and refusing to support her, the husband violates a legal duty and commits a breach of contract, which entitles the wife to redress, either by divorce, or to the enforcement of the marriage contract by compelling restitution of conjugal rights to the extent of maintenance, at her option. If she chooses the latter she ought not to be starved into the former, for that would force her to abandon the marriage contract against her will.

With reference to the articles of separation between the parties to the case at bar, see 1 Saxton, 386; Guth v. Guth, 3 Bro. Ch., 504, and notes; 4 Paige, 516; 2 Ves. Jr., 198, 199; Schouler, 294; 1 Bish. M. & D., § 634; id., 806; 2 Story's Eq. Jur., § 1427; id., 1428; 1 Bish., M. & D. ch. 32; id., ch. 38; 2 id., ch. 19; Schouler, ch., 17; Tourney v. Sinclair, 3 How., 324; Carter v. Carter, 14 S. & M., 59; Stephenson v. Osborne, 41 Miss., 119; Weathersby v. Weathersby, 40 ib., 462. But the agreement, by its own terms, is annulled by the subsequent voluntary cohabitation of the parties.

See further, 4 How., 109; 15 Ala., 141; 6 Pick., 89; 1 Ohio St., 403; 16 Ill., 278; 4 Iowa, 321; 27 Ct., 14; 2 Bright, H. & W., 69; 2 Johns., ch. 206; 5 id., 464; 6 id., 25; id., 178; 3 Cow., 590; cases cited in Bouvier's Law Dic., Alimony; and a late case, Iowa, as reported in the American Review, for April, 1875.

And thus it is, that in the progress of society, the fictions, technicalities and pretexts of the past, give way, one by one, as hindrances and embarrassments to the due administration of justice.

Decree affirmed and cause remanded, with leave to answer in forty days from this date.